Council, we'll call the case of Americas Insurance Center Inc. and Nagel Rice, docket number 20-1506. Good morning, Mr. Nagel. Good morning, sir. Mr. Nagel, before we start, I do have a threshold question for you, and that is, could you tell me what it is you want us to do in terms of, are you looking for a remand on this record, a reversal on this record? And if you're looking for either, could you just tell us what it would look like? I think the fair result on the record we have before us is a remand and a full hearing, potentially a remand to replace the Trustees Council with our law firm who will properly litigate the case. You will recall on this record, we requested over and over again that we be permitted to litigate the case at no charge to the estate. Jeff Sherwood, in the first hearing where he rejected the first proposed settlement, said, I may be inclined to do that. It's clear to me that we just haven't been given a fair shake by all the players here, and I think on this reclamation for the estate of way over $411,000, understand that that figure was set as of February of 2019. It's already two years later, and those commissions are continuing to run, and I'd like to right the wrong. If our firm is not substituted, obviously, I would like the Trustees Council and their job, because their job was not done in this case, and we argued for years, do your job, please, and that's what I'd like them to do. I'd like them to get the proper discovery and the proper record. May I tie into question number one now, Judge? Please do. Okay, so I think Your Honor cut to the chase properly, and I hope I answered it in a way that makes sense, but what's really going on here, and I think question number one under the February 11th letter really crystallizes my concerns as well, and that is in order to make a determination as to whether this deal was fair to all creditors, there needed to be a full and complete record, and there wasn't, and let's walk through the four points of what Judge Sherwood, the bankruptcy before him, when he concluded that the stripping, the termination of the joint venture agreement potentially would result in the cessation of the income flow. The first, the starting point is obviously the trustee's deposition testimony, and that's critical, and you'll find that at Joint Appendix 1388 and 89, and what's critical is we asked him a series of very simple questions, we basically said, did you analyze the future commissions? No. Did you analyze the net present value? No. Did you analyze whether there would be an attrition rate? No. Now, did you do anything at all to quantify either on a present value, if you were to sell it, or on a continual income basis, what the value to the estate would be? The answer was no to everything, and it was no knowing that we had already submitted in the record our own expert, Mr. Cohn, an insurance expert, who certified that there will be future commissions of between $75,000 and $90,000 per year. So, in the context of what we were pushing for, which is get an expert, please do your job, it was never done. Quite the contrary, and let's go to the trustee's supplemental certification. He submits a supplemental certification, which basically omitted any reference at all, and that is a Joint Appendix 1677. The trustee omitted any reference at all of any work he did to quantify the income stream, to see whether it would cease, or to get a present value to be sold. And again, in the marketplace today, books of commission income are bought and sold every day. It was never an attempt to do that here. And the reason was, is because this really was a, this was an inside creditor who made a deal with his colleague and close friend, whose personal relationship here, to basically strip the assets and circular, get it back in his pocket, which he did. And what was amazing to me is that, even with those facts, everybody with a straight face, the trustee and trustee counsel, with a straight face, came to court on two separate occasions, said, hey, let's get this deal done. Mr. Nagel, but that's only the case if we accept, we've got some arguments, but if we accept that Mr. Levy didn't need to do anything to maintain this book of business, right? If he, if it depended on his whining and dining and continuing to cultivate existing clients, then there's a reason for not just putting this out in, in the marketplace. And so I understand you contest that you've got a separate point on that, but that, that is a plausible reason why the district court might approve a deal like that. I respectfully disagree. And I'll tell you why. Because the, the, the income flow, the commission flow, and I say this because I grew up, I grew up in an insurance family. My father sold insurance for 50 years. The reality is any commission flow can be sold. That was not looked into here. So that was a value to the state that was never looked into. That didn't rely upon any future input from Mr. Levy. And to further, to further push the point, look at Mr. Levy's certification, because I was about to get to that. If that were the case, Judge Bevis, would we not expect to have Mr. Levy himself say, unless I am personally involved in the future, I know I grant you, I'm going to ask your opposing counsel about supplemental appendix to paragraph six, but right now I'm just saying that's a distinct factual question. That's a reason why one might not just put this out in the marketplace. Again, I disagree because, because commission flows in the future are sold without the input of the originating broker. It happens all the time. What in the record tells us that that is the ordinary, prudent, reasonable way to do this? That it was an abusive discretion for the bankruptcy judge not to require that? Well, and that's a great question. And here's the answer. Incredibly, during trustee's counsel argument, during Mr. Rabinowitz's argument, he said on two separate occasions, Judge, and potentially we need to look at the value of the income. We need to look at the value of the asset. Perhaps that should be done. It was never done. Even trustee's counsel during colloquy, during the argument said it. We, we submitted certifications that affect. Now, Mr. Peterson, who is an expert in insurance, submitted a two-page expert report for the trustee. That is devoid of any analysis of the two critical issues. A, the value today of selling it. He left it alone. And B, whether or not there would be an attrition in the future and the value of the cash flow in the future. He specifically did not do it. What he did do, which I thought was important, on exhibit A, he prepared a chart, which is in the record here, and I don't have the. Okay. But if you want to assign us to record things, you should tell us where we should look for them. You can follow up later. I do have it here. All right. So, Mr. Peterson, and I will get it as I'm talking. So, Mr. Peterson, in his exhibit A, basically said that based upon an income flow of a couple hundred thousand dollars, there would be a 1.75 multiplier. He gave us a valuation for one year. He gave it to us in exhibit A. And again, that was ignored by the bankruptcy judge. And I, again, I will be. Ignored? Ignored or just discounted, disagreed with? It was ignored. It was never cited at all in the opinion. The opinion of the bankruptcy completely overlooked the fact that exhibit A of Mr. Peterson's report actually quantified a one-year value. In the colloquy, Judge Sherwood also said many times about the value and nobody fixed the value. The trustee didn't do it, nor did Mr. Peterson. So, now I'm going to go, I'm going to go to the fourth point. We have Mr. Levy, who doesn't say a word about value and doesn't say a word about losing business in the future, or he doesn't say anything about servicing the account. What he does say, which is critical, he says, and he admits, three of my key employees were hired by the Zerlet firm to service. And please, respectfully, don't overlook the fact that the Zerlet firm was getting 55% of the commission flow. They were not innocent parties here. They were profiting from this arrangement. Mr. Levy was getting 45% back, which under his own certification was 20% more than what the marketplace would generally do when you assign your commissions. This was not an unusual situation. Again, Levy himself says, when you generally assign your commission flow, you get 25%, I'm getting 45%. So, you have the Levy cert, which is silent on losing the commission flow in the event the assignment was voided. You have the Peterson report, which is completely silent. You have the trustee supplemental certification, which is completely silent. And you have the trustee's testimony. There are four separate areas where anybody could have addressed two issues. A, quantify, as Mr. Rabinowitz said in his argument, quantify the value of this. And that's the value to the estate we're losing. Nobody did it. The trustee didn't do it, nor did his expert, Mr. Peterson. Number two, nobody says, if we void this assignment, you're going to lose your cash flow. Nobody does it. And I'll tell you, here's the icing on the cake, sir. The icing on the cake is, we submit a certification saying that the value, which we'll maintain in the future, is between $75,000 and $90,000. Not denied by anybody and not addressed by the trial judge. Not saying, by the way, all parties, you failed to rebut what the Naval Rice firm put in the record. You did not rebut that. I want to know why. That was never referred to by Judge Sherwood, the Mr. Rabinowitz, nor Mr. Trent ever said, by the way, that is simply not true. And here's why. They never brought in an expert. They never had Peterson amend his report. They never had the trustee say, you know what? I'm really concerned about losing it. The only place in record you're going to find this idea of if the assignment is voided, we're going to lose the cash flow is in a hypothetical in the argument of Mr. Rabinowitz. He says during the argument, it's my common sense. It's my view that if this doesn't go through, he's going to lose this commission in the future because he won't be involved. He says it, not Mr. Levy, not the but the judge said that the trustee had expressed this view. You're saying the judge was just mistaken in his ruling when he said that? Well, I'm saying he wasn't just mistaken. He had no factual basis to draw any conclusions because the only fact in the record he had was the fact we gave him continued cash flow, continued commission stream, 75 to 90. That's the only fact in the record. The joint appendix 1911, the bankruptcy judge says I've considered the confidential declaration of Mr. Levy, which we can argue about, and the arguments of the trustee. Yes. Satisfied that the trustee has looked into this issue. And that was not based upon a factual record. Why? Because look at the trustee's deposition, sir. Look at that. And you're going to find that in appendix 1388 and 1389. We asked them every direct question on this issue. And he said over and over again, I did not look into anything. I did not make an analysis. I did not quantify. And if you want, I can even quote the questions and answers, but you'll find it again, 1388 through 1389. We asked him at 1395, once you obtain the commission information, did you ever make a determination as to whether or not you should conduct an analysis as to what the true net present value of those commissions are? His answer, no. Okay. Did you ever determine how much money they could potentially receive above and beyond their judgment? This talks about future income. Answer, I have no idea. Okay. We asked him, did you do any analysis at all at joint appendix 1390 to 1391? In quote, did you conduct any analysis to determine the potential for future earnings as to these exact commissions? Answer, all right. I did not do any analysis because I don't believe a company would stay in business that long. There's no basis for that. He did no analysis whatsoever. And judge Sherwood, the bankruptcy judge, while he obviously was giving great deference to try to enforce settlements. And I understand that there's a policy that we should get cases settled. I'm not arguing that, but there's even a greater policy that all creditors should be treated fairly. And that's the law. And when we ask them direct questions, did you look at the future? No. Did you do any analysis at all? No. Did you do in that present value? No. Well, I'll pose this hypothetical question. If we're concerned about maximizing the asset of the estate and everybody agrees there's a net present value, including the Bederson company, why wasn't it quantified? Why was that not in the record? Why was it ignored? Why is there no finding? Was there no finding of fact by judge Sherwood, the net present value of those commissions as of today is X. And I think it's fair to settle. He never did that because he didn't have the facts. You cannot create conclusions without a factual record. I don't think I'm stating anything that's stretching the law. I think I'm stating something that at least as a practitioner for four decades is fairly common sense. We needed a factual record and it did not exist in this case. We move to the other issue, unless my brethren want to ask more. Move to the poison pill. You haven't been able to point us towards any authority that's even analogous here. Have you found any since then? Is there anything you can cite? The answer is I haven't pointed to that because our search of the country is that quite frankly, it's not done. Let's ask another question. Surely there are some legitimate basis on which the appeal would affect the outcome. The most obvious one is you're an unsecured creditor. If they get the money back from Levy, it's just you and Levy. The cost of the appeal are going to have to come out of somewhere and you're bottom. This money is not coming out of the trustee's priority claim for administrative fees or anything else. If the amount of a poison pill were proportionate to the cost, there's an appeal up to the district court, then there's an appeal up to us. If the cost of that appeal is in the neighborhood of $100,000 or something, then this is just like liquidated damage is not a penalty. Would that be unreasonable if the district court reasoned that way? Would there be any principle of law that would prevent a district court from guesstimating the amount that an appeal would cost? Yes, I do think there's a principle of law. That is to the extent that any poison pill chills or interferes with appellate rights for any creditor, I believe that that supersedes- You can't cite anything to me that goes that far that says you can't even charge you for the appellate rights. I can't cite anything and the reason is there isn't a single case except this one that finally teased the issue up. And in the two issues where appellate rights were interfered with, the two cases, one is a Supreme Court case and the other is the Seventh Circuit that has been cited by this panel. It's clear that courts just don't look favorably on any interference with appellate rights. Now in this case- It's clear even though you can't cite anything that says that. Let me add this on the poison pill issue. We permit appellate waivers and criminal plea bargains in civil cases and tax settlements. Why is this one so different? Quite frankly, I don't do criminal work so I really don't know that analogy. The reason why this poison pill I think is invalid or void as a matter of law because it quite frankly chills the appellate rights. Now I don't know the proportionality argument that was just raised by Judge Bevis but the reality is it chilled our right. We had to think twice. Now in this case, Judge Bevis and Judge Porter, in this case if the panel remands and opens everything up, then the poison pill issue theoretically is mooted because we start with a clean slate. Let me ask you about one of your other requests that in your opening brief, you asked that should we remand it that we appoint Megil Rice a special counsel and trustee. Is that appropriate in this sort of scenario? The answer is in this particular case and I'm going to call this a one-off because the facts here are really so disturbing and so out of the ordinary. In this he is an insider, he's an insider creditor who orchestrated a plan to divert monies to himself. That plan has worked and now he's got the trustee and trustees counsel supporting what we consider to be clearly inappropriate, improper, and bad deeds. So there is grounds to appoint us. Again, it's not every day that a creditor comes in and says appoint us as we have a claim as well. But in this case because we're the sole creditor, we really are the only party that's got interest in making this a full and complete record and getting fairness for all creditors. So we will litigate this case and to the extent that we have the Rabinowitz firm stay on board, remember they have attempted to rubber stamp two bad deals. The first deal was $100,000, we were getting $25,000 where the insider creditor was getting multiples of his $411,000, multiples. And then he came back to where he said, oh we have a brand new deal at $120,000 and despite our repeated request to be part of that negotiating process, we're excluded twice. When they finally filed the fraudulent conveyance action, the adversary proceeding against Mr. Levy, they did it under seal with under seal on facts that are presented in this case. They never explained it. The Rabinowitz firm is tainted. The trustee in this case respectfully has not done his job. And we think that we are really the firm to carry the torch and allow the full record to be developed and to get this case settled fairly. So yes, I think we can do it. You're a bit over your time and I don't recall you asking for rebuttal. Did you want some rebuttal time? I apologize. I forgot. Can I get- Yeah, yeah. How much time do you want? Grab me one or two minutes. That's fine. All right. So gentlemen, Mr. Trank or Mr. Rabinowitz, who wants to lead off here? Good morning, judges. John Rabinowitz. I'm going to take the lead on behalf of the appellees. I represent John Swilock, the chapter seven trustee of AIC. And I'm going to use the first part of my time to address the two issues that the court raised in its February 11 letter. And then if there was some remaining time, I'd like to address the has made a point and I just, so we don't lose sight of it. I'd just like to respond briefly to that point. The denial of retention of the Naval Rights Firm of Special Counsel is not on appeal to this court. It wasn't appealed to the district court. It hasn't been appealed to this court and there is a direct conflict of interest. So I just want the record to reflect that. So if I can judge judges, two issues were raised in the letter. One is, and Mr. Nagle uses the term poison pill. I would prefer to characterize it as a revision of the administrative creditors agreement to subordinate if there was an appeal because poison pill has a negative connotation associated with it. So the letter asked us to address that in light of the Lindsay case and the Clark case, and also to address the issue that the court has spent some time with Mr. Nagle on this morning. And that is the issue of the termination of the income stream if the two subordination. I would just note, and I recognize that there is a preference for courts to get to the merits and avoid procedural arguments. But I would just point out that this issue with regard to the enforceability was not raised below in pleadings or in statements of issues on appeal. It was raised in oral argument before the bankruptcy court and there are constitutional issues that have now been raised that have not been raised below. All right. They were raised very clearly at the hearings. And I don't see any obligation to spell it out in quite those terms in the notice of appeal. I'm not aware of authority that requires that. So I'm a little skeptical that it isn't preserved. Okay. I mean, I can, judges, if your honor wants a supplemental certification, there is case law that in the bankruptcy context that an issue has to be stated in the statement of issues on appeal, which is different. It's a different procedure than other kinds of appeal. But I recognize the desire to go to the merits. So that if I can. So what happened here? Administrative creditors who have a priority under 507A2 over all other unsecured debt except domestic support obligations agreed to give up a substantial portion of their dividend to make this settlement happen. And they have a right to do that. They have a right to do that. But you weren't doing this out of the goodness of your heart. You tried and it would have been a fine deal if the bankruptcy had chosen to approve it with nothing to Nagel rights, but they didn't. And so you didn't give up for nothing. You gave it up to make the settlement happen. You get your fee and close it now rather than litigating for years. So this wasn't a gift out of the goodness of your heart. Understood. But that's not to suggest that gifts are always given simply for altruistic purposes. In the bankruptcy context, when senior creditors gift to junior creditors, they're not doing it because they're charitable institutions. They're not doing it because they're kind. They're doing it because there is a either a legal or business reason to do that. And I don't deny that the purpose of making this deal happen was for finality. I'm sorry. I think that was just an echo on your end. I'm sorry. What am I doing wrong? Time now. No, keep going. So in fact, why did we give it up? We did it for finality. We did it to minimize litigation risk. And we did it to delay administration, to avoid delay of administration of this chapter seven fee. And I believe those are legitimate reasons. They weren't done just to stick it to Nagel rights and impair some way their appellate rights, I don't think they were impaired, but that wasn't the reason that it was done. It was done for those legitimate administrative and business reasons in the interest of judicial economy. And so we did gift. We gifted substantial funds just for the record to reflect that the total administrative expenses today are over two hundred and eighty thousand dollars. But the bankruptcy court would declined to approve the initial proposal that would have insisted upon your priority. The bankruptcy court wanted something to go to Nagel rights. And so the question we have to confront is, is it OK to make that contingent? Now, for consensual deals, Judge Porter is quite right. Criminal cases, tax cases, waivers of funds. But this is a non consensual. It's a penalty. What I want to understand is in contract law, liquidated damages are fine, penalties aren't. Is there any basis for putting this on the liquidated damages side of the line? Is there any basis for in the record that's had an appeal, the time, the expense of the appeal going to come out to the neighborhood of 50 or 100 thousand dollars? There was nothing discussed like that at the bankruptcy court, was there? Well, there was a discussion as what the total administrative expense could estimate it to be to litigate of roughly two hundred and seventy thousand dollars was the number that the bankruptcy court used for administrative expense. Specifically, the portion that would be allocable to an appeal to the district court and an appeal to this court, because that's basically what they were taking away from them. There's no discussion of that. There was no discussion with regard to identifying what the cost of an appeal was. We can give more information to the court today knowing what the cost of the appeal. Can you give me a ballpark, understanding that this is just off the cuff, a ballpark, an order of magnitude as to what the cost of the appeal to the district court and then the cost of the appeal to this court has been? In the spirit that it is a ballpark, the difference between what is owed today, what was owed at the time that the bankruptcy court made the entity order approving the settlement, it was one hundred and twenty or one hundred and thirty thousand dollars. The total fees now are roughly two hundred and eighty thousand dollars. So the difference is another one hundred and fifty thousand dollars of fees have been incurred to get up to this point in time. Can I directly say to the court that every dollar of that additional one hundred and fifty thousand dollars is allocable to the two appeals, one to the district court and one to the circuit? I can't say that. OK, I'll put Mr. Nagle on notice on rebuttal. I'd like to hear from him if he has any basis to dispute that is totally unreasonable. But that's helpful just as an officer of the court. That's the ballpark. And maybe some fraction of those fees went to other things other than the appeal. But that gives us a ballpark to work with. OK. And Judge Bevis, if I can address, I don't think it's a liquidated damages penalty analysis. The fact is that it's permissible gifting. And in fact, a third party can say, I will do something to facilitate this settlement, but I will do it on a condition. The conditions here were judicial economy. That was the condition that was imposed for giving this gift to make this settlement happen and close this case. Except it's not styled as a gift. It's part of the bank of confirmation of a plan and distribution of assets that the court is approving. You're not doing this outside of court. The court is making you do something like this. So I don't know that the court made us do something like this. We did it in the interest of judicial economy to get this case closed. Yes, the court made a comment earlier that it would not approve a settlement that provided nothing for Nagler-Rice. We were mindful of that, obviously. But I think we went a long way to fulfill the court's desire to see that there was a distribution of $50,000, which is a 31% distribution to Nagler-Rice, which was better than any other general unsecured creditor was getting. It was better than administrative creditors were getting. It was better than what Olander Feldman on a security claim was getting. So we went a long way to try to be mindful of the court's comments that it was not going to approve a settlement that simply benefited administrative expense here. But in the absence of some authority, this court has identified two lines of cases which I think are both factually and legally distinguishable. What are they? Lindsay was an equal protection analysis, and I think on an equal protection basis it's distinguishable. But Lindsay also was clear that it was concerned about indigent litigants who had an economic barrier to pursuing their appeal rights. And they relied upon a number of cases. I think there were four cases, if my memory is correct, that were instances where criminal defendants, prisoners who were indigent, wanted to file writs of habeas corpus and, in fact, couldn't afford the transcript that was required. They couldn't get a free transcript, and the requirement to cause them to pay was deemed impermissible. That is what Lindsay relied upon. We don't have that here. Nagler-Rice, by no stretch of the imagination, is indigent. They're not poor. And there was no economic barrier that they had to pay out of pocket in order to appeal. And, in fact, their appeal rights have not been prejudiced. Why? They appealed. There is an appeal today. And what happens with regard to the outcome of that appeal? There are two possible outcomes. They win, in which case their rights are not prejudiced because we now are back in a litigation mode and they share the risk like everybody else in this case is going to share the risk. Or they lose, in which case this court has determined that the settlement is appropriate. So their rights, their appellate rights, have not been foreclosed. They have, in fact, appealed. And because of the only two potential outcomes there, their rights have not been prejudiced, no economic barrier, and they are not indigent. So on the facts, Lindsay doesn't apply. Let's just spend a moment, although nobody has raised it, although Lindsay discusses it, whether there was an equal protection denial under the 14th Amendment or— No, you can move on. Okay. All right. I would submit respectfully that there is no equal protection denial, that there was a rational justification. As I explained earlier, that is judicial economy as the reason. So I won't address the particular—so I think it is a clearly enforceable provision from third parties in the interest judicial economy. It's not a liquidated damages or it could be a liquidated damages, but it's not a penalty provision. It's reasonable under the circumstances and it didn't impair Negro rights as rights to appeal. So let's talk about the second issue that the court has raised with regards to—in its February 11th letter. And that is—I also think that the Clark is distinguishable on facts as well, but the court didn't do anything here. It simply approved the settlement in Clark. It's the court taking specific action. So what happened here? So the court did an analysis in approving the settlement. It said that I estimate a litigation recovery of $500,000. And then from that litigation recovery, it went through a series of analyses to determine what Negro rights would receive, given the priority scheme in the bankruptcy court and litigation risk in terms of fraudulent conveyance, actual intent, subordination under 510C, all those kinds of issues. So the key here to that analysis or the starting point with regards to the analysis is was it reasonable? Was there a factual basis for the court to say $500,000 is the number? At that point in time, $411,000 had been received. And so the court put some kind of additional enhancement from $411,000 to $500,000 after that litigation fund. Now, I think Judge Wiebes, you correctly pointed out in referring to the transcript of Judge Sherwood's ruling that he said, I relied substantially upon the levy certification. So what does the levy certification say? It says three things, that he incurred an expense to maintain the book, that a licensed broker was necessary to retain the book, and that there was attrition over time with regards to the book. And what do I mean by attrition over time? That these premiums are not automatically renewed, that over time, for various reasons, the amount of commissions go down, people choose not to renew, pricing changes, they go to another broker, people die, whatever the number of reasons are for attrition. A lot here is going to depend on what the broker, what had to be done to maintain it. So Zurluch's agreement with America's Insurance agreed to reimburse for travel and entertainment expenses. There would be records of reimbursement. I've not seen any records of reimbursement. And I thought that levy didn't maintain in SEPA Act 2, paragraph 6, that there were any T&E expenses. Levy is just booking against this a proportional fraction of his rent and overhead for secretaries and stuff. There's nothing specifically allocable to the need to maintain these accounts. So what basis is there to say that he had to take affirmative steps and invest time or money in maintaining the accounts? Well, one of the primary things he had, first of all... was an allocation formula. So we can quibble as to whether he should have put in specific expenses rather than allocating some general overhead. But in fact, that's the methodology that was used. Okay, but he's not allocating a fraction of time or entertainment or other things that would to do the work of maintaining these accounts. That suggests that they're putting substantial work into it. So what suggests that he had to lift a finger to keep these commissions rolling in? Well, he had to do one thing that was key above all else. There had to be a valid broker's license. Okay? So if in fact... let's just follow through the scenario. AIC was the original party to the book of business. It was a licensed broker. And Zurslip did a substantial portion of the servicing. But AIC, under the JDA, have a covenant that says it's their business. It's their book of business. They're not selling the book of business to Zurslip, just the servicing component. And in order to maintain that book of business has to be a licensed broker. Okay. Now your argument is inconsistent with your earlier argument. The argument now is he just had the license, but then anyone with a license would have sufficed. Why does it have to be an insider who suspects with a license? The earlier argument was, and the argument on which the bankruptcy court relied, was that Levy had to put substantial work into making this happen. Now you're postulating that the work's being done by Zurslip's three new employees, and that it's just a broker's license that does it. You're defending the reasoning, the result below, on a ground different from the reasoning on which the bankruptcy court relied. Well, your honor, I'm not abandoning that Levy did something to maintain the book of business. Okay. Is there any basis for supporting the different court's reasoning? Could you answer me before you go to alternative ground on which we could affirm? Is there anything in the record that supports, any facts that support that future commissions would stop absent Levy's investing time and effort? Set aside the broker license for a minute. Point me to what in the record. Okay. So outside the broker's license, there isn't a specific fact which supports a conclusion that, in fact, that if Levy's services, although it's not an unreasonable inference, Levy's services terminate, that the income stream terminates. So the key paragraph of the bankruptcy court's reasoning at JA 1911, I've considered the confidential declaration of Mr. Levy, which admitted doesn't say anything about marginal efforts, and the arguments of trustee. I'm satisfied the trustee has looked into this issue, which Mr. Nagel attacked with some vigor, and I want to hear your response to it. And you know, if I had to handicap it, I'm not convinced that if Mr. Levy walked away from this business deal with Zurliff and walked away from the policyholders, the clients, that this income stream would continue indefinitely. So you are not able to point me to any facts on the record that say Levy in particular, as opposed to any licensed broker, is necessary to keep the income stream running to its natural conclusion. Your Honor, the difficulty with the argument is you can't separate out the licensed broker component from anybody else substituting in for Levy to provide that service and function. So let's just play out. Okay, what in the record? Point me to something in the record that supports the district court's reasoning for the district court's result. Okay, the district court's reasoning relied on a review of the findings of the bankruptcy court. The district court does not. I'm sorry, I'm talking about the bankruptcy court. I read the paragraph from the bankruptcy court's ruling in FAA 19. I misspoke. No, it's my fault. So what supports the bankruptcy court's reasoning, which the district court deferred to and accepted? So it's really the bankruptcy court here that has this key defending. The trustee has looked into this issue. If Levy walks away, then the income stream stops. Well, Judge, there doesn't have to be. We have cited case law in our brief. There doesn't have to be a specific factual finding for everything that goes into the approval of the settlement. But I'll answer the question if I can. So you can't separate out the licensing from the broader issue that your honor is raising. So let's assume that we win the litigation, the two assignments are voided, and then the interest in the counterparty interest in the JBA reverts back to the AIC Chapter 7 estate. One of the obligations under the JBA, which was before the court, okay, one of the obligations of the JBA is that the counterparty, because it owns the book of business, it never gave up ownership of that book of business, has to be a licensed broker. AIC is no longer a licensed broker. The trustee is no longer a licensed broker. So really what this comes down to is after years of litigation, litigation expense, assuming we win, at that point in time, the trustee, which could be five years down the road, three years down the road, the trustee has to run around and find somebody, a licensed broker to substitute in to maintain the book of business. And we are supposed to be able to monetize that book of but it's not the ground the bankruptcy court discussed. Let me ask, maybe that's your answer to my next question, but I want to hear about this. Let's assume that we squint and we say, look, you just admitted there's nothing specific in the record about future commission stopping. If we remand, is that what you're going to rest your head on if we remand for new evidence about why Levy is adding value here that justifies it? Is it just you need a license, or is there anything more that you would offer to prove on remand that Levy is adding value? I guess in a perfect world, which we don't live in, we could on remand expand the record to see what he specifically incurred with regard to any given account. We could do that on remand. But to me, the strongest argument here, and I reiterate, is that a license has to be maintained and there is no license that exists with regard to this book of business. The ability short of winning the lawsuit to be able to monetize this book of business today is almost nil. All right. Let me then take you, Mr. Nagel argued with some force that there is a going market. Now, I'm not sure if this is in the record or not. You can argue maybe it's not. But if you don't have a basis to say he's not right, if he's right, he also says, and again, I'm not sure what to do with this. He says the going rate in his experience is 25%. There are other brokers willing to do this for 25%, and Levy got 45%. What do you say about that? Is he wrong? Is it that he's just making this stuff up or raising it for the first time on appeal? If you had to remand and go back on that, is that an issue you'd win on? Too little, too late is essentially my answer to that. He had an opportunity over several years to raise all these issues. And on the eve of the approval of the Second Amendment, he submits a two-page net opinion, which wouldn't survive Daubert as the only thing. He's never controverted or put anything in the record to support any of these statements that he said today with regard to appeal. I can't address them. I don't know. But the fact of the matter is that an objecting party has some burden of proof, both legally and factually, to support their objection. And other than the properly discounted net opinion that was submitted at the last moment, they've done nothing to put anything into the record to support that. Now, that's the expert opinion that he kept referring to? You're saying it was- The Cohen opinion. No, there are two, Judge, so there's no confusion. And I'm running over time, Judge, and I appreciate the court's indulgence. There are two opinions involved here. Opinion number one is the trustee's opinion that he obtained in the early stages from Peterson, okay? And that was what Mr. Levy was- Mr. Levy, sorry, I apologize. Mr. Nagel was referring to Exhibit A. And just so the court has it, you asked for an appendix reference. The Exhibit A appears at JA-1703 and JA-1704. So those are the references that Mr. Nagel was making. So there is an exhibit where there is, contrary to what Mr. Nagel said, a present value discounting valuation of the income stream. And what does it say? It says, back then, it was worth $7,780. That's what the opinion said, okay? And when Mr. Nagel says that the trustee did no investigation, he was responding to a question as to what he physically did. He also said, I relied upon my expert, and I reviewed the expert opinion, and I relied upon counsel, and I relied upon my 40 years plus of experience as a panel trustee. So picking and choosing, cherry-picking statements as to whether he physically did the analysis. He did rely upon, there was due diligence done, and he did rely upon a report. And so what does Peterson say, again, appearing at JA-1702? He says, back then, there was a settlement proposal of $30,000. Nothing came to my attention after doing this analysis, nothing came to my attention to cause me to believe that the economic terms of the proposed settlement, including payment of $30,000, were unfair to the estate of ISD from a financial point of view. So there was an expert report that the trustee relied upon. So I'm sorry, I got off topic for a moment, but I just thought that was important. So Your Honor, you had asked me a question, I don't know if I responded to it. Anything else, Judge Beebe, Mr. Judge Porter? Mr. Trank? Yes, good morning. And first and foremost, I hope everyone's healthy and safe, and thank you for your time. So what's critical here is, this is not some settlement, and this court can tell from this record, this is not some settlement that was ran through. There is basically was two years, and there were countless mediations. And every time Mr. Nagel said he wasn't part of it, I was in Judge Sherwood's chambers on at least four or five, six occasions with not just Mr. Nagel, but all of his colleagues. And there was enormous effort that went in by the trustee, by the trustee's professionals, by us providing substantial evidence. And this is what's is pivot and say we should value the book and see what the run out is. With all of the uncertainties, because it was said in this record, and it's clear, this is not like life insurance. I go and get a half a million dollar term for a 20 year fix, and all I have to do is live, and my premium is set. What is clear from the supplemental appendix is every year, the risks are evaluated, there is a shopping, the broker of record can be changed at any time. Can you tell me where that is clear in the supplemental appendix? I've got it open in front of me. Yes, paragraph 12, SA 0003. Unlike some other types of insurance, business property and casualty insurance, that's what's licensed, businesses must be earned every year, meaning that every year. Okay, so I can read that. I don't think it goes nearly as far as that. What I want to ask is you're Mr. Levy's lawyer, okay? And I credit what you just said as an officer of the court. But as an officer of the court, I want to ask you about a countervailing fact. Has your client, can you represent to me your client has spent significant time servicing these accounts since AIC sent them to Zurich? The marginal investment of time, entertainment, travel, that kind of thing. And again, the answer is that I'm not going to tell you how many hours it is, but it's a constant monitor. Keep in mind that question, and again, this record is so replete, and I hope you'll allow me to get back to, you don't even get to this issue until you deal with whether they can avoid the 2014 and 2015 assignments. But the short answer directly, your honor, is that the work is done, not just because of the license, but because again, he has to monitor it. Now again, Zurich... We got three employees at Zurich who went from AIC who are working on these accounts. So what in the record, what record evidence is there that Levy had to invest significant time or did invest significant time in servicing these going forward? Because I got the supplemental appendix open. I read these paragraphs you're put significant work into doing this. By the way, I do want to note that notwithstanding Mr. Nagle's scorched earth litigation strategy, he never sought to depose Mr. Levy like he did the trustee who made the business judgment. But your honor, paragraph six that your honor has referred to... Paragraph six is an overhead computation based on his rent and his secretary and his photocopiers and fax. It does not establish that he did travel and entertainment. He says specifically he didn't bill for T&E. He's not whining and dining the clients here. I've not seen anything in the record that supports that, even though that's what the district court cited. Well again, the bankruptcy court as you say... Bankruptcy court, I'm sorry. No problem, no problem. But again, as you cited earlier in the JV agreement, he did have a right to charge for it. He just didn't do it in this analysis. And again, there was not a... When this is being done, when this certification is being put there, it is exactly for the reason that your honor referred to earlier. What they're trying to do is understand the math and understand the math as to how much had been collected on the stream pursuant to the 2014 and 2015 assignments. Not asking whether he is the critical link. Because again, as Mr. Rabinowitz said, there was not... There was never a situation where Mr. Nagle, and he put a lot of resources in it, came in and said, I'll offer more than $120,000. I believe if I get an assignment, I can go shop this book and somehow it'll yield whatever it yields. And the reason he didn't do it, your honors, is because he's nowhere near that. We have statute of limitations arguments. We have... Keep in mind, the only way this case ever is prevailed on by the estate is if they prove under the fraudulent conveyance statute, an intent to hinder delay in the fraud creditor. And as your honors know... No, no, there's a contingency here, no question. But let's talk about the reasoning. The district court said, look, there's a bunch of contingencies, but a home run here would be $500,000. Correct. Now the district court, the bankruptcy court, does not have to figure out the probabilities if the home run best case scenario is no better for him, right? Yes. It could have found there's only a 5% chance of that, and that would be a or whether a home run is $800,000 or a million. So that depends. The reasoning of joint appendix 1911, that key paragraph, depends on they needed Levy involved and working the accounts to keep the income stream running. And I'm not seeing record citations that say he had to invest marginal time, effort, money, things like that. And I understand exactly the analysis, but keep in judge Sherwood is doing kind of an overall check and balance. He's not discounting all the hurdles. And he does say specifically here, you've got a lot of... Your honors said it correctly. So that's a home run. And again, he doesn't sit there and say, you've got a 5% chance of winning or 10%. We're not in Atlantic City. We're sitting here saying that he's saying, you've got a lot of hurdles. And I don't see that... And the court said, this is not even a close call. Because again, I would say he's got a 0% chance of ever getting that book back. That's my position. And Mr. Nagle said that's 150%. He's ready to go to Atlantic City now. But the trustee doing his job over years and the bankruptcy judge being there and close to it and saying, hey, I'm scanning all the issues. I'm looking at promoted success. I understand your argument. You're giving us an alternative basis to affirm, but you are not able to cite anything to me other than supplemental appendix 2 and 3 as record support for the... Here's what the home run would be. As opposed to, you don't get to the home run because you're going to be tagged out at first or second base. I get that argument, but it's a different argument from one the bankruptcy court rested on. But it wasn't the only basis. When you see Judge Sherwood's analysis on JA-1911, he's accepting... He's going down the road with Mr. Nagle. He's saying, okay, you want me to go down that road? And then what he's... It was so important about the record that this court has is don't forget under Submicron, this court's decision in 2006, they not only have to win, they have to subordinate Mr. Levy and NBL's claim. And Submicron said that's not happening because it's not a penal remedy under 510C. So it is... I get exactly what happens on 1911, but it's because Judge Sherwood is being deferential and saying, I want to go down the road to show you how it never gets you to the promised land. And I just want to go back. So again, looking at the supplemental appendix, you have the issues in paragraph 15 on SA-0004. It says that there's already been... This third sentence here says, the AIC book has already seen exceeding 50% due to the factors set forth in paragraph 12, Your Honor. So that's not insignificant that over a period of a few years, it's already winding down. This is not like life insurance. This is... After COVID, I don't even know if any of these businesses are still around. So you can't criticize the bankruptcy court and the trustee for saying, hold it now. The whole system recognizes that we got to try to get to yes. And it does matter how long bankruptcy cases last. This case has been going on, as you know, since 2010, not just in the bankruptcy case, but going back to when Mr. Nagle represented AIC. So every time he says this was an inside deal and stripped assets and all of that color, it does not take the court to what was before the bankruptcy court, what Mr. Rabinowitz's client, a trustee for 40 years, Mr. Zwaila, he probably tried and settled thousands of cases. And he has this pile of claims and he has all the defenses. And the one thing this court can easily take judicial notice, the fact that we spent $280,000 getting to this court, you know, if we go back, there's no summary judgment here. There's not a 547 preference case. This is intent to hinder delaying the fraud. And when the trustee, based upon that record, after going through mediation, after hearing Mr. Nagle and all of his positions, says at the end of the day, the best interest of creditors are met by this number being cashed on the barrel and putting to a settlement. It does not, and I know Mr. Nagle didn't refer to it, there is no third-party releases being provided in this case. So that whole claim that Zerloff or anybody else, that's not a derivative claim was somehow baked in here. This is not a case like that, like Covington or any of the other cases that were supported. This is a plain derivative claim. This is a core matter that the bankruptcy trustees and bankruptcy courts approved, looking at, scanning the issues. Your honor was correct in saying, well, what's the probability we could play poker all night? We know it's money, time, expense, and complexity. This is not a slam dunk. There is no summary judgment ever happening here. And we will spend, if there's a remand, another five years on this case and another half a million dollars in legal fees. And it'll come up again because whoever wins or loses, there'll be plenty of issues. And that's why 90-19 trustees are done every day of the week before bankruptcy courts. Thank you, your honor. Thank you. Mr. Nagel? Yes, I respect that. I did ask for about two minutes, but there's so many issues raised by Mr. Trent that I have to, I may ask for a little bit more indulgence by- Can you bring it home in five? Yeah. So let me check off a number of items. Number one, it's critical to take a look at JA1893, which is the transcript of Judge Starwood's opinion, where at page 30 at 1893, he talks about a potential value in excess of $800,000 if we were to in any way capture five years of the future. And Mr. Rabinowitz never denied that. In fact, Mr. Rabinowitz at line 20 says, the real question is, can he monetize it? Can he sell or sign that book of business? So you have the trustees' counsel saying there is real value here. Mr. Peterson did not, contrary to what Mr. Trent said, did not monetize anything, did not fix the present value, and never addressed the future income stream. So it was completely devoid. The record was in excess of $800,000 in terms of value, which means that the insider will recover two times his claim and my firm will get 30%. So that's number one. Number two, you've heard Mr. Trent tell you, oh, there is no third party releases. What he didn't tell you is that Judge Starwood has ruled that our state court claims against Mr. Zurlip and the lawyer partaking in a scheme to strip and divert assets has been barred. He argued that it's derivative. So he knows that we, as of now, and he knows that that's on appeal to the district judge, Judge Aurelio. So when he says there's no third party releases, he's got to complete the sentence. He knows it's been barred, and that's another way to tie the hands. What he also didn't tell you is, do you know how many years it took us to get information from him and his client? Do you know how many times we had to trustee, get the amount of money that your client, that Mr. Levy has put in his pocket? It took us years before he was finally, finally did it. He was ordered to do it. He contested it. He moved to quash. He did everything possible to disrupt this and make sure his client's facts would never get on the table. And we finally got him on the table. Judge Bevis asked a question during that specifically set forth in paragraph 14 of the Levy certification. AIC receives a 45% share of the gross commissions generated by his book of business, which is higher than the normal 25% share given to property and casualty insurance producers. So that is, I took that directly from paragraph 14. So that answers that question. Understand when Mr. Trank tells you, we were involved in the deal, the neighbor rice was absolutely 1,000% false. Do you know that the deals were negotiated behind closed doors with our involvement? And the only mediation was when we objected to the deals, we weren't involved in the deals. They made their deals. We were told about it. And then we called Judge Sherwood and said, Judge Sherwood, this is no better than the first $100,000 deal. This is no better than anything. We should be involved. We should have our input. And by the way, if there were no grounds to file a fraudulent conveyance to action by the trustee, why would he have done it? Why would he have tried to recoup for the estate? We believe over a million dollars. Mr. Nagel, I know you've got some other points. I definitely do want to hear, do you have any basis to dispute what Mr. Rabinowitz said, that the cost of this appeal, maybe it's not a full 150,000, but that's a ballpark? I do. And I'm going to give you an answer having started my career at a large firm, and I know what it is to bill. And I know what it is to bill at high rates. I can tell you that we took the brief that we did before the bankruptcy court and the district court, and we tweaked it. And that's the appellate brief. I would be stunned. I would be stunned, quite frankly, to tell you that if we have more than 25,000 in time between the bankruptcy appeal and this appeal, I would be stunned if it was more than that on my books and records. We keep computerized records, and I will certainly take a look at it. But I can tell you that the first objection to this deal, we simply took it, and we moved it forward, and we changed cover pages. We put in the jurisdictional insert. I mean, we've done many, many Third Circuit appeals, and this was, quite frankly, one of the easiest appeals to put together because all the work was already done. So again, even if it's 25,000, you have a penalty factor of two to one. It is a penalty. Well, but there were two levels. There's one level up to the district court and a second level up to our court. I would say that the level to this court cannot exceed $15,000 in time. I would be stunned if it did. It was done mostly by my junior partner, Brad Rice. I tweaked it and signed off on it. But if we spent more than $15,000 on these briefs, I would be stunned, quite frankly. So that should be a direct answer to his surmise. There is no human way that the trustee's counsel could have spent $150,000 on this. It is absolutely, totally, and completely impossible to spend $150,000 at the trial level and then up to this. It just can't be done. I mean, I was in a big firm. You can't spend that kind of money on an appeal. Not this really. And last but not least, and I'd like to just take a step back and, again, apply common sense in this appeal. We keep hearing about we're going to lose the cash flow. We're going to lose the commission in the future. The assignments were done in 2015. As of 2019, they were still generating six figures a year. Where did it go? Were we losing the property casually? Of course not. Year after year, from 2015 to 2019, it had generated $411,000 as of February of 2019. That was less than four years. It's generated over $100,000. So this argument about Mr. Trank, oh, it's going away. We're losing it. Of course we're not losing it. It's in the record. Year after year, it generated huge income, and it hasn't stopped. It keeps going. So to the point, when we were asked to what's in the record, certainly the trustees council could have filed a motion to settle the records. And by the way, on issue number one posed by the panel, by the way, we've now been fully attritioned and we've lost our cash flow. Of course not. You know where the cash flow is today? It's in the pocket of Mr. Levy, who came up with his lawyer this phenomenal scheme years ago, and now circular and right into his pocket. That's where it is. So to that extent, it still continues and there's no proof otherwise, except our expert who says it has and will continue. So I hope I did five minutes. Thank you, sir. Excellent. So council, let me go back to your comment about common sense for a minute. Given the fees in this case and the playing field, wouldn't it make sense to try to resolve this by way of settlement? And what I'm going to suggest before you say no, is that maybe Joe Torregrossa from the circuits mediation group meet with you folks to try to get this case settled. I personally went to judge Sherwood to try to get it settled. I argued before judge Morton. I am dying to get this headache done. And one of the ways we can get it done is if they allow us to go against the others involved in the scheme, I'll go in the state court against Mr. Zerlip and we will recover in the state court. But no, no, Mr. Trenk has cut that off already. So I'd love to get the case settled. Well, Mr. Trenk, is it worth having these discussions? Yeah, obviously. I always think it's a good idea to have discussions. So I think that we certainly would participate. In good faith, right? You're all going to participate in good faith? Always. Mr. Rabinowitz, you on board? Your honor, yes. The trustee has participated in every negotiating session, every mediation, and has demonstrated its good faith by virtue of all administrative creditors willing to give up historically a substantial portion of what they are otherwise entitled to under the priority scheme and the bankruptcy code. But it requires all parties good faith. It means that when sessions are scheduled, people show up. Oh, no, absolutely. And don't give reasons why they can't show up and that they negotiate meaningfully. The trustee has no money to put on the table to make this happen. I don't want to get into any of the nuances with respect to settlement. What I'm going to suggest we do is I'm going to reach out to Joe Tarragosa. He will then reach out to you gentlemen to schedule at least an initial conference call, see how you go forward. I'm going to ask that you folks split the cost of the transcript, the cost of the transcript in this case, but I'm not going to ask that you spend any money in the hopes that you can resolve it with Mr. Tarragosa. And if you could get back to us within, well, let me do it this way. I will ask Joe Tarragosa to get back to us and let us Absolutely. It does for me and I appreciate that except for one caveat. It took me three years to get for Mr. Trank the amount of money that his client get. As long as he discloses it, I'm fine to talk, but I need to know the money so we can quantify the settlement. This is not a pathway for more discovery. That's all Mr. Nagle wants. This is a pathway to try to resolve it. So let's reach out to Mr. Tarragosa and I'm taking your word for it that you're all going to show up and move forward in good faith. All right. Thanks for your time. Thanks for your briefing. Have a great day, guys. Thank you. Stay safe. Thank you. Stay safe. Thank you.